On an appeal from a decree of the High Court of Chancery.
The case was this. Long had contracted to convey to Colston, by special warranty, all his interest, derived from his wife, in an estate in England. Both parties supposed it would far exceed 6,0001. sterling. Colston was to take the entire value of the estate in England, at one pound currency for one pound sterling, and to pay Long in hand SS,000, and convey to him western lands to the amount of $15,000, at two dollars per acre; and whatever the English estate, when finally ascertained, might exceed the sum of $20,000, Colston was to pay Long at the above rate. A suit having been for many years depending in England, concerning this estate, Colston was to receive a power of attornej' from Long and wife, to attend to its ^'conclusion. It was further contracted, that in the event of a revolution in England, (which was then apprehended,) by which an obstacle to the recovery of the estate might be produced, no reimbursement was to be made by Long, nor was Colston to be bound by his bond, which he had given in pursuance of the contract, to secure the payment of the excess over the $20,000: but nothing was said about any reimbursement by Long in case the estate fell short of that sum. Long and wife conveyed their right to Colston, but without any privy examination of the wife, as it was said; and Colston paid the $5,000: but understanding that the English estate, (though not finallj' ascertained) did not amount to more than 3 or 4,000 pounds, chiefly in three per cent, stock, he refused to convey the lands to Long, unless he would give him security to refund, whatever that estate might fall short of the payments actually made. Upon this refusal, Long brought an action of covenant on the articles of agreement, in the District Court of Winchester; and while the suit was depending, Colston filed a bill in the High Court of Chancery to enjoin the proceedings at law, and to transfer the case from the former Court to the latter; which was directed accordingly by the Chancellor.
The controversy principally turned on the following points. 1. Whether after a breach of the contract by one party, as was alleged, and the other had elected to proceed at law for damages, a Court of Equity could properly interfere on the grounds stated in the bill. 2. Whether under a fair exposition of the articles and a bond taken in pursuance thereof, Long was entitled to the $20,000 at all events, or only a rateable proportion according to the value of the English estate.
The Chancellor, being of opinion that a Court of Equity had jurisdiction, and that Long was only entitled to be paid pro rata, according to the value of the English estate, perpetuated the injunction, “on the complainant’s conveying to the defendant such of the lands described in the contract between them, as are equal in value to the difference between the sum of $5,000, (which the complainant had paid,) and the defendant’s proportion in his wife’s right of the Chichester estate in England.”
Williams, for the appellant. There are two questions in this cause. 1st. Whether the case was not completely cognizable at law; and, if so, ought a Court of Equity to have interfered? and 2dly, if it ought, whether the decree is not erroneous. *It will certainly not be denied, that either party, on the refusal of the other, might bring a bill for a specific performance ; or, elect to proceed at law for damages. But after one party has resorted to his legal remedy, the other cannot be permitted to go into a Court of Equity.
If it should be said that Colston did not refuse, then he must have succeeded at law, and this being a question equally triable there, the injunction ought not to have been awarded. But, if he did refuse, then Long had a legal advantage given him by the conduct of Colston, and a Court of Equity ought not to have taken it from him. Long- *62 had executed his part of the contract: if Colston had offered to do the same, he must have prevailed.
But it may be said, a Jury might have assessed» imaginary damages; and their verdict must have been for money although land was to have been conveyed. To this it may be answered, that the rules of property, rules of evidence, and rules of interpretation of contracts, in both Courts, (except in the case of a discovery from the defendant,) are the same.(a) If the Jury had adopted an improper rule of construction, a Court of law was competent to correct it, by setting aside the verdict.
It majr also be urged, that application was made to a Court of Equity to do that, which the parties had stipulated for. Had Colston' performed his part of the contract when he ought to have done so, Eong would have been satisfied; but having refused, Eong had his election, and might with great reason, proceed at law for damages, because he had to pay .money on another contract, instead of lands,, in consequence of the*refusal of Colston.
But it will be argued that Colston was willing to perform, agreeably to his idea of the contract. If this had‘been a fact, and his exposition a correct one, then proof of such offer, and of a refusal by Eong, would have entitled Colston to a verdict; for there would have been no breach. The evidence, however, is, that Colston refused to perform, unless Long would submit to new conditions not warranted by the contract.
Having considered the question of jurisdiction as the case appeared on the words of the contract, the next inquiry would be whether there is any thing dehors the contract to create an equity.
The bill being for a specific performance of the contract and not to rescind it, Colston must be considered as applying to enforce It on his own part, Long having already done all that he was bound to do on his part. The contract being *thus sanctioned, the only inquiry is, ought the Court to decree it, or leave the party to his remedy at law?
It is said, indeed, that Eong deceived Colston with respect to the value of the English estate; but of this there is no proof. They were both probably under an erroneous impression as to its amount, and Colston had the best means of information. If he was deceived, it was by his partner Gen. Lee, who professed to have an accurate knowledge of the subject. Or, If the latter should be considered only the agent of Colston, still the effect would be the'same. Notice to an agent is sufficient, even to make a party a purchaser with notice. Lee was apprised of the intention of Eong, to have the $20,000 in every event. It appears then to have been a fair transaction on the part of Long; but if it had been fraudulent, It might have been a ground for setting aside the contract, not for decreeing a specific performance. ‘
On the second question, he contended that the decree was erroneous, even if the Court of Chancery could properly interfere._
1. Erom the fair exposition of the contract itself, Eong was to have the $20,000 at all events. The preceding part of the sentence, which prescribes that Long should not be responsible in the event of a revolution in England, is complete in itself. It then goes on to stipulate, that, as to the sum paid, no reimbursement should take place. The bond which was executed on the same day, in pursuance of the agreement, proves the ideas of the parties to have been as here stated. So does the deposition of Mr. Lewis, who reduced the contract to writing. If it is objected, that his is parol evidence; it may be answered, that such evidence is admissible to explain the intention of the parties to a deed or agreement where it is ambiguous or doubtful. In the case of Ross v. Norvell,(b) parol evidence was admitted to prove an apparently absolute bill of sale a mortgage; and it is there laid down that the admission of it must depend upon circumstances.
2. The decree is also erroneous In compelling Long to take lands to which Col-ston had no title.
3. In not directing an account, and making a final end of the cause.
4. In not decreeing the lands elected by Eong to be taken agreeably to the contract.
Call, for the appellee, contended, 1. That Colston was not bound to pay the sum of $20,000, at all events, but *only a rateable proportion. Wherever there is a deficiency in the article sold, unknown to the buyer at the time of the contract, a' Court of Equity will give relief, unless there is an express stipulation to the contrary : for an implied stipulation will not do.(c) He also cited the case of Bedford v. Hickman, (MS Nov, 1804,) in which there was no proof of fraud on the part of the vendor, but the Court gave relief to the vendee on the general principle. In Pen-dleton v. Stuart (also MS April, 1804,) there was an express stipulation to take at more or less; but in the agreement between Eong and Colston there is not a syllable of this nature. Colston knew nothing about the value of the estate. The presumption is, therefore, against his having intended such an agreement. A bargain of chance is generally a matter of speculation; but, here, Colston could not calculate on gain, but might lose; since, if the value of the estate exceeded $20,000, Long was to have the surplus. The property had been in suit ever since the year 1742, and might continue many years more. The small profit arising from the difference of exchange was a mere mocker3r, and besides very uncertain, the rate of exchange being subject to fluctuations. The terms of the written agreement also confirm this construction. The clause concerning political convulsions or revolutions provej plainly, that Colston was to bear a loss occasioned by such events only; according to the maxim that expressio unius est exclusio alterius. Mr. Williams, by a violent criticism, separates the member of the sentence, by construing it so that no reimbursement was to take place in any case; whereas its evident meaning is that *63 no reimbursement was to take place in that one ease. The articles and bond are to be taken together, and as explanatory of each other; the fair meaning of both being that for the entire value of the Chichester estate 11. currency was to be paid for 11. sterling.
2. Parol evidence cannot be admitted in this case to explain the writing. In Gate-wood v. Burrus, (a) the distinction is stated between latent and patent ambiguities. A separate, independent, collateral fact may be proved by parol evidence to explain a latent ambiguity, relative to the person or thing, or a resulting trust, (b) In the case of a resulting trust, it is admissible, in order to rebut the implication which might otherwise take place, but not to contradict a deed, or explain ambiguous words, (c) In this case there was no latent ambiguity; and therefore such evidence was not admissible.
*3. But even upon the depositions, Colston ought to prevail. It appears that Bong was guilty of concealing part of the truth in the representations he made concerning the value .of the estate. The case of Shirley v. Stratton, (d) shews that a concealment of essential facts by one party from the other will vitiate the contract. If it be said that Bong gave Colston some information, why did he not give him all he knew, by which the value might be reduced, as well as that which tended to enhance it? Mr. Williams says that Gen. Bee was agent for Colston; and his knowledge was that of Colston; but not a title of testimony exists that he had any knowledge of the value of the estate.
Mr. Call here took a view of the evidence ; from which he argued, that Bong did not dream there would be a deficiency, and therefore made no stipulation about it; that both parties believed the estate would be worth more than $20,000; which belief on the part of Colston, was produced by representations made by Bong himself; that the difference of exchange was not given as a premium for hazard, but a recompence for the expense and trouble Colston was to be at in recovering the estate; and that the. $20,000 were to be deducted, (on the final ascertainment of the value of the estate), at the above ratio from the cash value; from all which he inferred, that, upon the merits, whether on the writings or the parol evidence, Colston had paid Bong as much, or more than he ought, and had done all that could reasonably be required of him.
4. But Bong has not done all that he ought to have done. He and his wife have not conveyed their interest. If Mrs. Bong be dead, nobody but her heir can get the money from England: and if she be living, her husband or Colston cannot, without evidence of her consent, (e) Bong is bound to shew by some paper in the record that he has executed a deed, and that the privy examination and relinquishment of Mrs. Bong has been taken. The grantor is bound to pay the expense of the deed.
JUDGE CARRINGTON.
It is the custom of this country for the grantee to pay that expense.
Call. The doctrine is expressly otherwise in Co. Bitt. The bond, I admit, states that a deed had been executed: but this is to be construed as executed by Bong alone, since there is no proof that his wife had done it; and her conveyance, except by privy examination, &c. is worth nothing.
*5. The decree of the Court of Chancery is right, so far as it goes; for which the Chancellor himself has given able and sufficient reasons. It is objected that an account ought to have been directed: but the decree has provided for this, by reserving a right to resort to the Court hereafter.
6. The Court of Chancery had jurisdiction ; because the Court of law could not have given complete relief. If no suit had been brought at common law, Colston might have gone into equity to have the value of the Chichester estate ascertained, and the writings delivered up, on his conveying to Bong land sufficient. Does it make any difference that Bong first went into a Court of common law? If it does, the principle would apply to every case commenced at law, and would abolish injunctions to stay proceedings on judgments. Recourse was necessary to a, Court of Equity; because there was reason to believe that the Chi-chester estate would be deficient, and the bill was filed upon the principle of quia timet. The deficiency was uncertain, the suit in England being still undetermined. A Court of common law, therefore, could not have restrained the parties, until that was ascertained; and, if a judgment had been obtained, and Colston compelled to pay the money, he would have had no security for its being refunded.
It is objected, that a judgment should have been confessed, or the cause decided, before the injunction was granted.
I answer, that a confession of judgment would have defeated Colston’s object. It would have been confessing that which he had denied, and which was uncertain. Injunctions before judgment are very numerous. The cases, of an heir obtaining 'an injunction, during the pendency of a suit against him on his ancestor’s bond, and of an injunction awarded pending an ejectment, often occur, (f) The requiring a confession of judgment is discretionary with the Court, which may lay the party under proper restrictions.
Mr. Williams contends, that where relief can be had at law, none can be had in equity. In 3 Ves. jun. 692, (g) the contrary is held, on the ground that the nature of the relief is different in the different Courts. In equity, specific performance may be decreed; the conduct of the parties, and all equitable circumstances may be considered. From 4 Ves. jun. 686-689, (h) and 4 Bro. *64 Ch. Cases, (a) it appears that where a party has let the time elapse, he has no right to insist on a literal ^compliance with the contract. Here, Long ought to have had the privy examination completed by a certain time; and there is no proof that he has done it at all. He has thereby lost the benefit of the contract.
The decree, however, is incomplete in one respect. As Long has received more money and land than the English estate is worth, the Chancellor ought to have directed him to hold the land, subject to any future decree.- — 'With an amendment to that effect, this Court ought to affirm it.
Wickham, on the same side. If Colston was, at all events, to pay 20,000 dollars, the contract was in the nature of a policy of insurance, and ought to be governed by all the rules which are applicable to such instruments. If Colston was an insurer, he could not be liable for any risk against which he did not insure. Now it appears that the only risk contemplated was that arising from revolutions and political convulsions, not from any prospect of a deficiency in the value of the estate; for no doubt was entertained by either part3r of its being worth more than 20,000 dollars. No insurance, therefore, could have been intended on that subject. Is it probable that Colston, a stranger, would have insured that the fortune of Long’s wife, which lay in England, and of which he knew nothing, except by information from Long himself, really amounted to 20,000 dollars? For such a contract there was no quid pro quo. In policies of insurance there must be a true representation, and either fraud or mistake will vitiate the contract; one of which took place in this case ; for Pollard’s deposition proves that Long did not make a full representation, but concealed several important circumstances. If a warranty had been intended, Long would have insisted on the largest sum, and Colston, the insurer, on the smallest. But the fact here was exactly the reverse. As Colston wanted money in England,, and to dispose of as large a quantity of his Kentucky lands as possible, and Long wanted money here, Colston increased the sum as much as he could; and this accounts for the sum of 20,000 dollars being fixed upon. It is unimportant whether the parol testimony was admissible or not; because, either with or without it, the construction of the contract would be the same.
As to the question of jurisdiction; a bill for specific performance lies for either party, and ought to be favoured; for more complete justice can thereby be obtained than at law; since the damages given by a Jury may be too much or too little; and in no case do they give the thing contracted *for, but money in its room. One party cannot, bjr bringing an action at law, deprive the other of his suit in equity for a specific performance. It is objected that Colston violated the covenant himself. But, if the condition of a bond given for the purchase of land is violated, will that prevent the obligor from going into equity to obtain a title?
JUDGE LYONS.
Would not the Chancellor compel him to give a judgment, before he would grant an injunction?
Wickham. This is the rule in actions for sums certain, but not in those for damages only. In the case of Morris v. Braxton, the vendor, although not able to convey at the time stipulated, yet obtained a decree when able afterwards to convey. So, in-the case of Pollard v. Rogers, where only able to convey a part.
In those cases, although the vendors filed their bills for specific performance, they might have been sued at law, and damages recovered against them for their breach of contract.
But in this case Colston was not, in fact, guilty of a breach ; for he was willing to-convey as much land as he was responsible for pro rata, though he refused to convey any more; but Long demanded the whole, notwithstanding he had violated the contract on his part.
But, it is said, that Colston had not lands to convey; as the Indian title was not extinguished to some that he claimed. This objection has no weight; because, if Colston is not able to convey, a compensation in damages may yet be given, (so far as he may fail,) by directing a Jury to be im-panelled for that purpose.
Let it even be admitted that a judgment ought to have been confessed in the first instance: yet the decree, being right on the merits, ought to be affirmed. The example of a bill of injunction, where security ought to have been given, and was omitted, is parallel to this. In such a case, if the complainant has equity on his side, on the final hearing, the injunction may be made perpetual; and the omission of taking security, being merely matter of form, ought not to vitiate the decree.
Randolph, in reply, went into an examination of the evidence, to prove that Long was no speculator; that the first overtures-came from Colston, who, leagued with General Lee, used every artifice to prevent Long from selling his share of the Chichester estate to any other person ; — that a clause in the agreement shewed that the estate was *known to have been sold and vested in the funds; — that all Long’s right was transferred by special warranty; —that Colston knew the situation of the estate, and, if he meant a rateable deduction to be made, ought to have inserted a clause to that effect in the agreement; and that the design of both parties extended only to-the case of an excess of the estate over 20,000 dollars; not to that of a deduction, if it should be under that sum. The event of a revolution in England ought not be construed as the only contingency intended to be guarded against for the benefit of Long; for other contingencies, although not expressed in the agreement, were equally understood.
1. Pothier on Obligations, citing the Digest, sect. 81, says, that those things which, for the purpose of removing doubts, are inserted in contracts, shall not affect the rights of the parties in other respects. The case of Mortimer v. Gapper(b) shews that, where a fact is doubtful, or equally *65 ■unknown to both parties, the contract will be enforced, (a)
The cause might rest here upon the contract itself: but it was farther strengthened by the parol testimony, which, he contended, was admissible to explain it. (b)
In answer to the general doctrines, relative to a deficiency in property sold, quoted from 2 Pow. Con. 196, 197, 1 Call, 316, Jolliffe v. Hite, and Bedford v. Hickman, he referred to 5 Burr. 2831, (c) and 3 Bro. 451, (d) to shew, that where a consideration has been paid, no deduction is to be allowed for a deficiency, without proof of fraud.
On the question of jurisdiction, he laid down the doctrine in the abstract, that, where a party has been brought into a Court of Law for violation of a contract, he shall not compel the adverse party to accept a specific performance, unless equitable circumstances should exist to authorise him to do so; and observed, that none such existed here; that the remedy was complete at law, and Chancery ought not to have taken jurisdiction.
The decree was also defective in compelling Long to take lands, which now had fallen immensely in value, and the titles to some of which were defective; or, indeed, any lands without a provision for insuring the titles; and, in not directing Colston to give security for any future sum of money for which he might be responsible.
Curia advisare vull.
Friday, November 7. The Judges delivered their opinions.
*JUÜGB TUCKER.
Before I en-_ ter upon the points which I purpose to consider in this case, X shall premise, that both from the bill and the evidence, I am fully satisfied that Lee and Colston were original partners in this bargain, probable from its first inception, previous to Long’s visit to Colston’s house ; and that Lee was from that period the agent of both, and that whatever Lee did in the business was binding upon Colston, being matured and concluded in his presence. That Lee was, probably, as well informed as Long, of the situation of the property in England, before the parties met at Alexandria; and that although there is a charge of misrepresentation made against Long in the bill, there is no proof of any representation whatever from him to Colston, in the character of a purchaser, or one treating for a purchase. That as Colston seems to have studiously concealed his participation with Lee, in the contract then in agitation between Lee and Long, and denied any intention to treat with Long for the purchase, the conversation between him and Long is not to be regarded as between persons treating about a bargain, but merely as between indifferent persons.
The original contract, after reciting the nature of Mrs. Long’s title, and that the proceeds of her estate were invested in the English funds, (not particularizing which of them,) contains a covenant on the part of Long and wife, in consideration of the covenants therein after contained on the part of Colston, to assign and convey to him all the right, title and interest of Long and his wife therein, with a covenant for further assurance, &c. In consideration of which, Colston agrees to pay Long 20,000 dollars down, upon the execution of the contract, viz. 5,000 dollars in cash, the “residue in lands situate in the State of Kentucky and the territory N. W. of the river Ohio, to be selected from a schedule of locations and surveys thereto annexed, and part of the covenant, by Long, for which Colston is to be allowed two dollars per acre, and of which he is to make every necessary conveyance in fee-simple, against the claims of himself and his heirs, and inasmuch as some of them are only entered, Colston to bear the burthen and expense of their being surveyed. And further, as the value of the said estate (in England) is not ascertained, and the parties mutually suppose that its value, when ascertained, will far exceed 20,000 dollars, Colston covenants to execute a bond to Long, to pay him whatever may be the excess beyond the 20,000 dollars, at the rate of one pound currency for a x>oamd sterling, after deducting *'by the same ratio the 20,000 dollars aforesaid.” Then follow some other covenants not material to consider; then a covenant that Long and wife shall execute a cotemporary power of attorney to Colston, empowering him to receive the value of the estate, &c. but the appointment of agents in England shall be made by both parties —'and then this clause — '“And further, the said Colston is to proceed with every possible dispatch to ascertain and secure the value of the estates thereby covenanted to be transferred, and to bear all expense attendant thereon. And further to avoid every opening for after construction, and render the meaning of the parties as explicit as possible, it is understood that Long and wife are only to convey their title and interest to the said estates, and that of their joint and several heirs. And that if any change or convulsion in the government of Great Britain, should occur, as an obstacle to the recovery of the said estates or the proceeds thereof vested in the funds, they are not to be contemplated as responsible therefor, and as to the sum paid, no reimbursement shall take place, and that if any such event should happen, the said Colston, os the other hand, is not to be bound by his bond.
On the same day Colston with Lee his security' executed a bond to Long in the penalty of 100,000 dollars, in the condition of which, after reciting the former part of the agreement, as far as the stipulation to pay a pound currency, for a pound sterling of whatever should be received in England by Colston, the words of the bond proceed thus, “whereby it was meant that for the entire value of the said estates or stock in the funds in sterling money of the kingdom of G. Britain, the said Colston was only to give the said Long, only one pound Virginia currency, for one pound sterling, &c.
Where there is a written agreement, the whole sense of the parties is presumed to have been comprised therein, and it would be dangerous to make any addition in cases where there does not appear any fraud in *66 leaving out any thing. This is a general rule. (5 Co. 68, 1 Fonb. 200.) .But the parties to this instrument have taken uncommon pains to manifest their full sense of the bargain, as expressed in the original articles of agreement, by that clause which professes to avoid every opening for after construction, and render their meaning as explicit as possible. If then the agreement thus concluded and explained, can *admit of a satisfactory explanation, we are bound to give it that, and that only which the words will bear.
I shall premise, that the consideration and inducement to the agreement on the part of Long and wife, is not the payment of the sum of 20,000 dollars, in the manner proposed, as a sum or price in gross, but that he undertakes in consideration of the covenants therein after contained on the part of Colston ; by which it appears clearly to my apprehension that the 20,000 dollars was considered by both parties as a partial payment only, for an estate, the value and amount of which depended upon future information and -computation: for neither party professes to know the real value or amount of the estate, though both parties acknowledge their belief, that it will far exceed the value of the 20,000 dollars. Let us suppose a merchant anxious to purchase a large crop of wheat just cut, but not yet threshed out, was to agree with the owner of the wheat for the purchase of his whole crop, which both parties supposed would far exceed a thousand bushels, and to pay him down 1,000 dollars, on executing his contract, and at the same time to give his bond to the owner to pay him whatever might be the excess beyond 1,000 bushels, at the rate of one dollar per bushel, after deducting the 1,000 dollars paid by the same ratio. Could any one hesitate to pronounce that this was a bargain for the crop, at the rate of one dollar per bushel, andan advance made in part payment at the rate of one dollar per bushel, arid to pay for any excess at the same rate? Then would not equity say, in case the crop should fall short of 1,000 bushels, the owner must refund to the purchaser as many dollars, as the wheat falls short of the sum advanced? To my' apprehension such a construction is,irresistible. For as the bargain was not to pay a sum in gross, for the wheat in gross, let it hold out more or less than 1,000 bushels, but to pay according to the number of bushels, whatever number there might be above 1,000, so the principle of mutual and reciprocal benefit and loss, which enters into all contracts, in which there is any hazard which neither party has expressly taken upon himself to bear, requires there should be an abatement in case of a deficiency below the value of the sum advanced.
But it has been contended by the appellant’s counsel, that the explanatory clause, at the end of the agreement, shews it was the intention of the parties that there should be no reimbursement of the 20,000 dollars, in any event. Let us then suppose that our wheat merchant and the owner *had added a similar explanatory clause in these words — “It is understood, that if by any accident the wheat should take fire, and be burnt up before it is delivered, the seller is not to be contemplated as responsible therefor, and, as to the sum paid, no reimbursement shall take place, and if any such event should happen, the buyer, on the other hand, is not to be bound by his bond.” Could this stipulation be understood as having any relation but to the destruction of the wheat by fire? Or could it in any manner be construed to relate to the just quantity which the whole crop should amount to? I conceive not.
The agreement then is to my mind clear, and explicit enough to shew that the 20,000 dollars, to be advanced, was not a price in gross, but an advance made upon the mutual idea of both parties, that the value of the estate would far exceed it, subject to a final adjustment, when the value of the estate should be finally known, at the rate of pound for pound; at which rate, in case of a deficiency, the seller was to refund, as well as to receive in case of excess — there being nothing in the agreement that shews me Colston took the risk of the amount upon himself entirely.
But it will be said that a Court of Equity will admit of evidence dehors the deed, in case of fraud, concealment, or misrepresentation, between the parties, or mistake or misapprehension by the drawer of the deed. (1 Fonb. 117 and 200, and the references.) The doctrine is not denied, but its application to the present case may, I apprehend, be fairly doubted. Let it, however, be granted that it ought to be admitted in this case.
It is a maxim, that contemporánea ex-positio est optima: and any collateral fact done by the parties at the time, which serves to illustrate their meaning and intention is, in my opinion, entitled to the highest respect, where evidence dehors the deed is admitted to explain the intention of the parties to the contract. Such was the bond executed by Colston and accepted by Long, on the same day, and probably at the same moment, as the original agreement; whereby it is expressly declared that “the meaning of the parties, in the original contract, was that for the entire value of t'he estate or stock, Colston was only' to give Long only one pound currency for one pound sterling.” The repetition of the word only in the same sentence, and even in the same line, however unnecessary and ungrammatical, affords some evidence of the solicitude of the parties that the contract should be distinctly understood. *And this explanation corresponds with and confirms my interpretation of the original agreement.
The evidence of Mr. Lewis, the counsel who drew the papers, is relied on to prove that the intention of the parties was, that no reimbursement of the 20,000 dollars advanced, was to take place in any event, of what nature soever; which words do not occur either in the agreement, or the bond, both which were, I presume, prepared by Mr. Lewis. To come at a fact like this, (I shall say in the words of lord Hardwicke in a similar case,) it is certain there ought to be the strongest proof possible, (a) I was *67 directed, says Mr. Lewis, to covenant between the parties that Colston was to give Long 20,000 dollars in prompt, to be discharged by S,000 dollars in cash, and 15,000 dollars in military lands: Colston to be allowed two dollars per acre; 2d. If there should be any surplus value of the estate beyond the 20,000 dollars, Mr. Colston was to have it, every pound sterling value for a pound currency; the terms of the bargain against Long were contemplated to indemnify the purchaser against the expense in clearing out the title from the pending law suit, &c. 3d. Upon the final ascertainment of the value of the estate, the 20,000 dollars were to be deducted at the same ratio from the cash value; and, 4th. The parties were only to make special warranties of the property sold and that received in payment. Such, we are told, were the contents of the notes furnished him to draw the contract by, which it has happened unfortunately, were not retained by him. If they had been retained, they, and they only must have been resorted to, to shew there was a mistake in the agreement, as not conforming to them. In the case of Baker v. Paine, (a) the articles of agreement in a case not very unlike this were rectified by the minutes. But here the minutes, as detailed by Mr. Lewis, correspond with the agreement, Mr. Lewis no where says he made any mistake in drawing the agreement, but enters into a long detail of his advice to Long, and the reasons upon which it was founded. He mentions, irdeed, a question propounded by Gen. Lee to Long, as they were coming out of Mr. Edmund Lee’s office, viz. “Mr. Long, provided we do not receive the 20,000 dollars, do you mean to reimburse them?” With the answer — “Imake tio such bargain.” But these were answers to leading questions propounded by Long, and have therefore less weight with me than if Lewis had mentioned them himself; and, even then, I should have thought they might be applied to the event of a convulsion *or revolution in England, so as to agree with the bargain; but
not by so loose a question and answer to contradict it. Lewis, by his own account, felt great solicitude for Long’s interest, and was employed part of two days in drawing the papers; duplicates of which were made out by him, and executed by the par-fies. It would be wonderful, under such circumstances, if he omitted any thing through mistake. This is not like the case of Fleming and Willis ; it approaches nearer" to the case of Lady Shelburne and Lord Inchiquin, (b) where parol evidence to prove a variance between articles and instructions was indeed admitted, but considered as having no operation on the case. There being no other evidence on this point, I conceive the meaning and intention of the parties is too fully expressed in the agreement itself to admit of doubt.
Much stress was laid, in the argument, •on the inequality of the contract, in favour of Colston. But inequality between the sum paid and received, does not of itself make the consideration inadequate: If it did, there would be an inadequate consideration paid or received, on every foreign bill of exchange drawn above or below par. In this case Colston was to pay currencjq pound for pound, for sterling. But when was he to receive the compensation for 20,000 dollars, which he was to advance? Not till after the death of Burgess Ball, who was tenant by curtesy of the English estate; nor until an adjustment of a law suit, already depending more than fifty years — nor until other legacies were paid and discharged, and the balance could be ascertained. The first of these events, only, has as yet happened ; and that happened three years after the contract, and might not have happened in thirty. There is nothing then in favour of Long upen this point. Whether either of the parties knew of these legacies, until the meeting with Shermer in January, 1798, more than six months after the bargain was concluded, does not, I think, very clearly appear. Be that as it may, from that period Colston had reason to doubt whether the money paid, and the lands he was to give to the amount of 15,000 dollars more, would not overgo the amount of the English estate, which he was likely to receive in virtue of his bargain. And, for any thing that appears in this record, that doubt has daily acquired strength, from the information of the agents of both parties, and still remains undetermined. — Upon these grounds, I am of opinion that Colston was well entitled to the aid of a Court of Equity; and that, *under the circumstances of the case, the relief sought, and that which has been obtained, so far as it goes, were both proper; since thereby the contract may be fulfilled on both sides, according to their original agreement, and justice done by a fair adjustment of accounts in a Court of Equity ; which probably could not have been effected in any other mode. That a bill for specific performance, lies as well on the part of the seller as the" purchaser, is evident from the case of Langford v. Pitt, (c) and Stourton v. Meers, there cited by the Master of the Rolls. I am the more confident in this, because Long was apprised, as appears by the agreement, that some of the lands he was to receive had only been entered, and Colston must have 'time to survey them and obtain patents. The conveyances in fee-simple were demanded by Peacock as attorney for Long, as furnishing a ground for an action at law for breach of covenant, in September, 1798; about fourteen months after the bargain, and probably much sooner than patents could be obtained in the ordinary course of proceeding, whatever diligence Colston or his agents, may have used for that purpose. Whether this was too rigorous a procedure on the part of Long, or not, it is unnecessary to say; but I think the injunction, upon the terms offered, was rightly awarded. Colston had performed a part of his contract to a very valuable amount, by the advance of 5,000 dollars. The agreement, as before observed, shews he could not possibly execute a conveyance in fee-simple for all the lands, part of them being only entered. It is a principle in equity, that where a party is, by accident, or other cir *68 cumstances beyond his own controul, prevented from executing the whole of his contract in specie, he shall be permitted to perform it as far as he can. Pollard v. Rogers, in this Court, was cited by Mr. Wickham to this effect. And, even if he can now make a title to the lands, it seems reasonable he should be permitted so to do; as in Langford v. Pitt, and Stourton v. Meers, above referred to. Colston, as I understand his offer in his bill, has actually executed a conveyance for so much of the •lands, which Long was to have of him, as is equal to the balance of the 20,000 dollars; which conveyance still remains in full force. If there were any of the lands selected by Long not comprised in that conveyance, perhaps the Court ought to permit him to ascertain his damages at law for the amount of the lands so “omitted. But still, I apprehend, no execution for the same ought to be permitted, but the verdict be cer-tified *into the Chancery, there to wait the final issue of the cause, upon a settlement of the accounts between the parties — with this difference, (if, upon examination, it should appear necessary,) I am of opinion that the decree be affirmed.
JUDGE) ROANE.
This is a bill of injunction exhibited by the appellee, praying to arrest the proceedings in an action of covenant brought against him by the appellant, in the District Court of Winchester. While that action was yet pending and undetermined, the Chancellor awarded the injunction, and, without requiring the appellee to confess a judgment at law, 'transferred to his tribunal the entire cog-nisance of the cause, which involved the construction of a contract. By that contract, the appellant had bound himself to convey to the appellee, his and his wife’s title to an estate in England, called the Chichester estate; whereupon the appellee was to pay him down five thousand dollars in cash, and fifteen thousand dollars in military lands, at two dollars per acre, and to pay him one pound currency for every pound sterling which the said estate (which was in the English funds) should, when finally settled, be found to amount to, over and above the said sum of twenty thousand dollars. So far the parties are agreed in their construction of the contract: but the appellee contends that, in the event which is now suggested to have taken place, of the estate’s falling short of that sum, a proportional reimbursement should be made out of the said sum of twenty thousand dollars; whereas the appellant contends, that in no eyent was he liable to submit to such an abatement.
This is the grand question between the parties. The covenant, on the part of the appellant, is, that he would convey the right to the English estate; (which, in the declaration in the action at law, is alleged to have been done, and which he might, in that action, have duly shewn to have been done, had not the progress thereof been arrested;) and the covenant, on the part of the appellee, the breach whereof is now complained of, is, that he has failed to transfer the military lands, which, by the contract, were to have been immediately and promptly conveyed. Notwithstanding the existence of this action upon this covenant, another action would lie on the same-contract in behalf of the appellant, in the-event of an excess beyond the twenty thousand dollars, and a non-compliance on the part of the appellee, with his stipulations-in relation thereto; and an action would also have lain in favour of the appel-lee, *(if his construction of the contract be correct:,) in the event of the value of the estate falling short of the before-mentioned sum. At the same time it is readily admitted, that in this very action for damages for not furnishing the-stipulated deposit, it was competent to the appellee to exhibit to the Court and Jury and contend for his construction of the contract, in this particular, and to shew the existence of an actual deficiency in the estate, by way of mitigation of damages.
But the appellee, neither choosing to do this by way of defence in the aforesaid action, nor to rely on it in any future action to be brought by him against the appellant, grounded on the event which is now suggested to have taken place, has evoked the subject from the Court of Law to the Court of Equity, and prays the latter tribunal to construe and decide upon the contract.
A translation of this kind can only be justified in the case before us, by particular grounds of equity existing on the part of the appellee, or by reason of the verity of that general and broad proposition, which is stated in the commencement of the decree in question.
In examining into the particular grounds in the case before us, it cannot be pretended that the appellee was under any necessity of coming into a Court of Equity for relief against any forfeiture incurred by him in relation to the military lands contracted to-be conveyed, or the like; 1st. Because he expressly states in his bill, “that when the appellant applied to him for a conveyance of the said land according to contract, he offered to do so, provided the appellant would agree to reconvey, or be otherwise responsible, in case of a deficiency of his claim on the Chichester estate;” thereby admitting his ability to convej', and requiring, as a condition thereof, a new or explanatory stipulation on the part of the appellant; 2d. Because the military lands aforesaid, being holden by the appellant by entries arid surveys only, in most instances, if not all, and this known to the appellant at the time of the contract, he could never have expected from the appellee more than an immediate transfer of his rights thereto, or, at most, regular deeds for them hereafter, when the titles should be completed; and, therefore, such a transfer would have been a compliance on the part of the appellee with his stipulation, and received as such in the trial at law; and, 3d. Because, if there were any of those lands selected by the appellant, to which the appellee has not, and perhaps never can obtain a title, (as is alleged by *him to be the case in relation to two entries in the name of Samuel Carey; see his letter to the appellant, of March 18, 1799,) this circumstance, so far from affording him a ground to come into a *69 Court of Equity for a specific performance, would, perhaps, have been a reason for confining his adversary to his action at law for damages: for it is said in Cuddee v. Rutter,(a) ‘‘that the Court, in case of a contract for the sale of land, which the party has not at the time of the contract, will not decree a specific performance of the agreement as to the land, but leave the buyer to recover his damages at law for nonperformance of the agreement.”
With as little reason can it be said that the appellee might go into the Court of Equity on the ground on which bills of ■quia timet are usually granted.
By his contract, he was bound to convey the military lands immediately, unclogged with any condition whatsoever; and the appellee trusted to the appellant’s personal responsibility to make good the deficiency; (if that event was contemplated and provided for in the contract;) but the ground he now takes in his bill goes to clog the transfer of the lands themselves with a new condition of reimbursement. This ground of complaint is moreover untenable, because it is as reasonable that the appel-lee should rely on the personal responsibility of the appellant in case of deficiency, as that, in case of excess, the appellant should rely on .that of the appellee; who had, from the moment of the signature of the contract, the estate of the appellant in his hands. It appears from the contract that both parties were safe and responsible men, and whatever the true construction of the contract may be as to the appellant’s liability to make reimbursement in case of deficiency, there is no pretence to say that such liability was attached to the land by way of lien. These remarks are made in objection to the appellee’s coming into a Court of Equity on this ground: at the same time it is readily admitted that if the cause were properly before the Court of Equity, and ripe for a final decision, by reason of the English estate being fully and finally settled and ascertained, it might be proper for equitj', which delights to do complete justice, to settle the case by making an abatement in case of deficiency out of the military lands themselves, which are contracted to be conveyed.
I come now to consider the general and broad proposition contained in the commencement of the Chancellor’s decree. I will premise that I highly approve of the jurisdiction of Courts of Equity on the point in question, as settled *by successive and well-weighed decisions; so far as it is auxiliary to the jurisdiction of Courts of Eaw; and so far as it goes to give to parties, who wish it, the specific execution of their agreements. But this jurisdiction must have limits: it ought not to ingulph and destroy the salutary jurisdiction of the common law. I wish not to see this small and precious germ which, within times not far remote, took root, and was with difficulty nourished as a wholesome and goodly plant, yielding its friendly aid to the soil on which it grew; now outstrip its proper size, outrage its own nature, and like the far-famed Upas tree, by Its deleterious effluvia administer death and desolation to all around it. I wish not to yield up every thing to that encroaching jurisdiction, which knows not the inestimable trial by jury, and is blind to the incalculable superiority of viva voce testimony. If there is any advantage arising from the union in this Court, of the common law and chancery jurisdictions, it is not the least that such union affords a check against the proneness of all men in all situations to advance and extend the sphere of their own authority. Under this organization, this Court, taking side with neither of the rival jurisdictions is free to restrain them, both within their proper limits.
The broad proposition now in question is this, that in case of a specific agreement, although the party grieved may have elected to proceed at law for damages arising from a breach thereof, yet, as he might have resorted to equity for a specific performance, and as in equity remedies ought to be reciprocal, the aggrieving party may compel his adversary to abandon his common law remedy and hold him down to a remedy for specific performance.
Whether this proposition, if true in the extent here contended for, does not go to the utter annihilation of the common law jurisdiction in such cases, and make a most important innovation in our system of jurisprudence, I will briefly inquire?
In the excellent treatise of equity, upon which Eonblanque has annotated, we are told, vol. 1, p. 27, that formerly the law of England was very defective in not providing for a specific performance of agreements:— “but it proving a great hardship in particular cases to be left only to the uncertain reparation by damages, which the personal estate perhaps may not be able to satisfy, Courts of Equity therefore, where there was a sufficient consideration, did, in aid of the common law, compel a specific performance.” Nothing is more clear than that this provision was introduced in favour of the person aggrieved by the breach of the ^agreement; as is manifest from what is said about the failure of the personal estate, &c. ; nor than that this provision was (as it is expressed) in aid and not in exclusion of the jurisdiction of the common law: — Vet we are told, ib. p. 31, that “the common lawyers continually poured out their complaints against this encroachment, as they imagined it, on the ancient municipal laws.” Eoud indeed would their complaints have been, if, instead of the just and reasonable pretension then advanced and now sanctioned by the concurrence of ages, this gigantic innovation had then been meditated.
I take it therefore to be a well established principle, that after a breach, a plaintiff may elect to proceed at law for reparation in damages, and that he cannot thereafter be compelled to go for the thing in specie unless he wants it, (b) or unless some particular grounds of equity exist, on behalf of the party breaking the contract, excusing and relieving against such breach, and shewing that, according to the principles *70 of equity, the contract ought, nevertheless, to be performed in specie.
It was argued, but ought not seriously to have been alleged, by the appellee’s counsel, that the sustaining the action at law injuriously converted the appellant’s claim from land into money. The answer is, 1st. That this objection is as broad and untenable as the general propositions just examined; and, 2dly. That it results from the principles of law and the contract of the parties, that, in case of breach thereof, the appellee has promised to pay to the appellant as much money as should be assessed by a Jury, for reparation of the injury : his original contract, followed up by a breach thereof, completely7 estops him from making the objection. It may truly be said that, in contracts for so fluctuating a species of property (in point of value) as those military lands were, time and punctuality are all important to the buyer; and that the default of the seller in not making a due transfer at the time, when the agreed price might have been procured therefor in the market, shall not prejudice the buyer in the event, which is alleged to have taken place, of an enormous depreciation in the value of military lands. If a loss is thereby sustained by the appellee in the present instance, it is a loss without an injury, and arose from his own act in not performing his agreement by tranferring the lands, but, instead thereof, keeping them in his own hands and at his own risk.
As to the objection, going to the uncertainty of a reparation *in damages, it applies equally, at least, in all other cases but does not overrule the general doctrine of the law giving the action. In the case before us, that objection has little weight, for the parties have agreed on the price of the lands in question: and, indeed, in all cases, capricious or injurious assessments of damages by Juries are con-troulable by the superintending power of the Courts. The objection therefore ought to be wholly disregarded in the case before us. ■ ,
Such are the grounds of my opinion in the present case. Not believing that the appellee was competent to come into a Court of Equity, when he exhibited his bill for an injunction, or that such Court ought to have taken cognizance of his case, (the Court of Law being the proper tribunal to construe the contract, and determine the action pending before it,) I have deemed it premature and unnecessary to enter at all into the merits of the contested question arising out of the contract. I have only incidentally examined that contract, in connexion with other circumstances, to-enable me to determine whether the appel-lee ought to have obtained foot-hold, and received countenance in the Court of Equity. On a full consideration of the case, I think that he ought not; but that his application for an injunction should have been rejected, and his bill dismissed; which (reversing all the subsequent proceedings in Chancery) ought now to be the judgment of this Court.
JUDGE CARRINGTON.
I am of opinion that the injunction obtained by Colston was premature, the value of the English I estate being not yet finally ascertained. It ought therefore to be dissolved, but without prejudice to any suit which he may hereafter bring to be compensated for the deficiency, when the .amount thereof shall have been ascertained.
JUDGE LYONS.
Neither a Court of Equity nor of Daw can vary men’s wills or agreements, (a) Courts should endeavour to understand them truly, but not to extend or abridge them. They may construe equitably when words admit of doubt, but cannot controul a lawful stipulation or contract, nor relieve against stated damages.
What was the contract in this case ? That Colston should pay Long twenty thousand dollars upon the execution of a conveyance for transferring to the former all the right of the latter and of his wife, to what was called the Chichester estate, in England ; that he should pay in cash five thousand dollars, and the balance in military land ; and, as the value of the Chichester estate was not ascertained, but supposed to exceed twenty thousand dollars, Colston *vvas to execute a bond to pay, at the rate of currency for sterling, for its excess above that sum. Was not this contract lawful and sufficiently certain ? The bond given for excess recites the agreement, and explains its meaning to. be, that, for the entire value of the estate or stock, Colston was only to give currency for sterling. Its condition was, that Colston should pay for whatever might eventually be obtained over and above twenty thousand dollars. Long and wife conveyed the English estate, and demanded performance of the agreement by Colston, who refused to convey the military lands, unless Long would promise to reconvey in proportion to what the English estate, when its value was ascertained, should fall short of six thousand pounds sterling, which Long refused to do, as that was no part of his contract : upon which Long brought an action of covenant at law for the breach of the agreement, and Colston brought a suit in Chancery to enjoin him from proceeding upon it.
An injunction was granted and made perpetual. The question is, whether Colston, according to his agreement, ought not to have paid the twenty thousand dollars, immediately on Long’s making him the deed, and whether he had a right to any aid or relief in equity, until the value of the English estate was finally ascertained ?
Long did not agree to wait for that ; but was to receive the twenty thousand dollars immediately, and says he was not to refund any part of it, in case of deficiency. But that is not the present question ; for that can be decided only when the value of the English estate shall be finally ascertained in England.
I think Long had a right to the twenty thousand dollars, immediately on executing the deed to Colston, and was not obliged to. enter into a new contract for refunding, in case of deficiency ; that he had a right to sue at law for the breach of the original contract; and that Colston was premature with his bill, before the value of the English estate was finally ascertained, according to the agreement.
I am, therefore, of opinion, that the injunc *71 tion should he dissolved, and the bill dismissed, without prejudice to any other suit he may bring in equity, after the value of the English estate shall be finally ascertained.
The decree of the Court was, that the injunction should be dissolved, and the bill dismissed, without prejudice.

 3 Black. Com. 434, 2 Burr. 1108, per Lord Mans-tfflELD In Long v. Laming.

 1 Wash. 14.

> 2 Powel on Cont. 196,197,1 Call, 301; Jollifie v. Hite.

 3 Call, 194.

 1 Ves. 232: King- v. Philips, 1 Bro. Gli. Cases 478. Foimereau v. Poyntz.

 8 Co. 155 a. b. Edward Altham's case, 3 Wils. 375; Meres el al. v. Ausell et al. 2 W. Black. 1219: Preston v. Merceau, ex’r Bumb. 65; Binstead v. Coleman, 4 Bro. Ch. Oases, 514, Rich v. Jackson.

 1 Bro. Oh. Cases, 410.

 2 Bro. Ch. Cases, 663; Minet v. Hyde, 3 Bro. Ch. Cases, 237; Bourdillon v. Adair, Anstr. 93. 4 Bro. Ch. Cases. 138: Pryor Y. Hill, 1 Anstr. 93; Edmonds v. Townshend.

 1 Atk. [491,1 568, Anonymous — 14 Vin. 423, 425.

r) Eaton v. Lyon.

Oi) Harrington v. Wlieeler.

 Lloyd v. Collet.

 1 Bro. Oil. Cases, 158.

 See also 4 Ves jun. 819, Gibbons v. Count.

 Ross v. Norvell, 1 Wash. 14. 1 Bro. Ch. Cas. 85, Maybank v. Brooks, 1 Ves. 457; Baker v. Paine.

 Beck, ex clem. Fry v. Philips.

 Burt v. Barlow.

 1 Ves. 319, Henkle v. Royal Exchange Assurance Company.

 1 Ves. 456.

Cb) 1 Bro. Ch. Cases, 338.

 2 P. wms. 630.

<a) 5 Vi.uer, 540, 2d Resolution.

 1 Fonb. 29, 139, 2 Bro. Ch. Cases, 343, diet, per Lord Chancellor, in Errington v. Annesly.

 3 Tuck. Bl. 485.